Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD, FIGEL, &
FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless
Association and USTelecom – The Broadband
Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable
Association*

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
505 Montgomery Street, Suite 1300
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs American Cable
Association, CTIA – The Wireless
Association, NCTA – The Internet &
Television Association, and USTelecom – The
Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiff NCTA – The Internet &
Television Association*

*Pro hac vice motion to be filed

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CABLE ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM – THE BROADBAND ASSOCIATION, on behalf of their members,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of California,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT** |

**COMPLAINT**

Plaintiffs American Cable Association ("ACA"), CTIA – The Wireless Association ("CTIA"), NCTA – The Internet & Television Association ("NCTA"), and USTelecom – The Broadband Association ("USTelecom," and collectively with ACA, CTIA, and NCTA, the "Associations") bring this suit on behalf of their members for declaratory judgment and injunctive relief against Defendant Xavier Becerra, in his official capacity as Attorney General of California, stating as follows:

**NATURE OF THE CASE**

1.     This case presents a classic example of unconstitutional state regulation.  The State of California has enacted SB-822, entitled the "California Internet Consumer Protection and Net Neutrality Act of 2018," directly regulating the provision of broadband Internet access services ("BIAS").[1]  This statute was purposefully intended to countermand and undermine federal law by imposing on BIAS the very same regulations that the Federal Communications Commission ("FCC") expressly repealed in its 2018 *Restoring Internet Freedom* Order (and by adopting even more restrictive regulations), despite the fact that both the FCC decision and the federal Communications Act of 1934, as amended ("Communications Act"), prohibit states from taking such action with respect to jurisdictionally interstate services like BIAS.  SB-822 is therefore preempted under the Supremacy Clause of the United States Constitution.  It also regulates far outside the borders of the State of California and unduly burdens interstate commerce in violation of the dormant Commerce Clause of the United States Constitution.  As the FCC has repeatedly recognized, due to the inherently interstate nature of Internet service, it is impossible or impracticable for an Internet service provider ("ISP") offering BIAS to distinguish traffic that moves only within California from traffic that crosses state borders.  Both the Supremacy Clause and the dormant Commerce Clause protect ISPs from a patchwork of inconsistent regulations that

---

[1] SB-822 is reproduced in Exhibit A.

2

COMPLAINT

are unduly burdensome and impossible to comply with as a practical matter.  The Court should declare that SB-822 is preempted and unconstitutional, and should permanently enjoin Defendant from enforcing or giving effect to it.[2]

2.     After careful review and deliberation, the FCC recently adopted the 2018 *Restoring Internet Freedom* Order, which established "a calibrated federal regulatory regime" for mass-market BIAS "based on the pro-competitive, deregulatory goals of the 1996 [Telecommunications] Act."  *Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd. 311 ¶ 194 (2018) ("2018 Order"); *see also* Notice of Final Rule and Announcement of Effective Date, 83 Fed. Reg. 21,927 (May 11, 2018) (announcing effective date of 2018 Order as June 11, 2018).  The 2018 Order protects Internet openness with a regime of transparency and disclosure rather than heavy-handed regulations.  Pursuant to that regime, the Associations' members, either on their own or through their Associations, have made public commitments to preserve core principles of Internet openness.  *See, e.g.*, 2018 Order ¶ 142 (collecting examples of members' commitments).  Those commitments, as the FCC explained, are fully enforceable by the Federal Trade Commission ("FTC") and state attorneys general under federal and state unfair and deceptive trade practices laws (provided they enforce such commitments in a manner consistent with federal law).  *See id.* ¶¶ 142, 196, 244; *see also id.* ¶ 242.  "Transparency thus leads to openness," *id.* ¶ 245, and the Internet has remained free and open since the adoption of the 2018 Order, just as it was under the longstanding light-touch approach that applied for most of the Internet's history.

3.     The 2018 Order also determined that BIAS is an inherently interstate "information service," as defined by the Communications Act, restoring the longstanding position that the FCC (on a bipartisan basis) and the courts had adhered to for decades.  *See id.* ¶¶ 20, 199.  The 2018 Order thereby reversed a 2015 FCC ruling, *see Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 ¶ 331 (2015)

---

[2] The Associations also are filing a Motion for Preliminary Injunction concurrently with this Complaint, based on the immediate irreparable harm posed by SB-822.

COMPLAINT

("2015 Order"), that BIAS should be regulated as a common carrier "telecommunications service" under the Communications Act. The 2018 Order similarly restored the FCC's longstanding determination that wireless BIAS is not a "commercial mobile service" under the Communications Act and therefore is statutorily immune from common carrier regulation. 2018 Order ¶ 74. Here, too, the FCC reversed a 2015 ruling, *see* 2015 Order ¶ 388, that mass-market wireless BIAS should be regulated as a common carrier commercial mobile service.

4.     Based on the disclosure regime and these statutory classifications, the FCC repealed certain "net neutrality" rules and regulations that were adopted in the 2015 Order and predicated on the classification of BIAS as a common carrier service. The 2015 Order had imposed five basic forms of conduct regulation on the provision of BIAS: a no-blocking rule, a no-throttling rule, a no-paid-prioritization rule, a general "Internet Conduct Standard," and a process for filing complaints challenging the reasonableness of ISPs' Internet interconnection and traffic-exchange practices. The 2018 Order repealed each of these measures based on federal law and policy mandating a light-touch regulatory approach to BIAS. *See* 2018 Order ¶¶ 1-5. The FCC also revised its longstanding "transparency rule" to specifically require ISPs to disclose blocking, throttling, and other practices to protect Internet openness through a policy of disclosure. *Id.* ¶¶ 220-223.

5.     In addition to reclassifying (and thereby reestablishing) fixed and mobile BIAS as services statutorily immune from common carrier regulation and repealing the above-described rules and regulations, the 2018 Order included a broadly worded express preemption directive, making clear that the 2018 Order "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing in order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in the 2018 Order. *Id.* ¶ 195 (emphases added). Notably, the primacy of federal law in this "inherently" "jurisdictionally interstate" context is one of the few points on which the 2018 Order and the 2015 Order agree: both decisions "preclude[d] states from imposing obligations on broadband services that are inconsistent with the carefully tailored [federal] regulatory scheme." 2015 Order ¶¶ 431, 433; *see* 2018 Order ¶¶ 194-195, 200.

COMPLAINT

6.      Notwithstanding the 2018 Order's binding legal rulings and clear preemptive effect, the State of California enacted SB-822, which, by its own terms, is deliberately intended to revive the rules the FCC repealed in the 2018 Order and thereby effectively nullify federal law. As explained above, the 2018 Order repealed the no-blocking rule, no-throttling rule, no-paid-prioritization rule, Internet Conduct Standard, and common carrier regulation of ISPs' Internet interconnection and traffic-exchange practices.  SB-822 now purports to re-impose every single one of those restrictions on any ISP providing BIAS in the State of California.  Moreover, SB-822 establishes restrictions that go *further* than those repealed in the 2018 Order, including banning outright the "zero-rating" of traffic delivered to users and imposing ambiguous restrictions on agreements for the exchange of Internet traffic with edge providers and other Internet network operators.

7.      In declining to ban zero-rating and paid interconnection in the 2015 Order, the FCC expressly found that both practices can provide significant benefits to consumers and edge providers.  *See* 2015 Order ¶¶ 152, 201.  Zero-rating—the practice of exempting certain content from users' data allowances—gives users more data for their money.  Paid interconnection agreements directly with BIAS providers allow edge providers to bypass the middlemen and content distribution networks they would otherwise pay to distribute their content, while also allowing them to bring their content closer to the computers, tablets, and smartphones of the consumers who wish to use it.

8.      California's attempts to revive—and indeed expand—a repealed federal regulatory regime are plainly preempted.  Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state measures that contravene validly adopted federal laws and policy determinations, including those contained in FCC orders, are preempted and have no force or effect.  Here, that preemption applies for at least two distinct reasons.

9.      First, the 2018 Order expressly preempts SB-822.  Given the inherently interstate nature of BIAS, the FCC has consistently determined that BIAS must be governed "by a uniform set of federal regulations, rather than by a patchwork that includes separate state and local requirements."  2018 Order ¶ 194; *see also* 2015 Order ¶ 433 (ruling that BIAS must remain

COMPLAINT

subject to "a comprehensive regulatory framework" at the national level that "preclude[s] states from imposing obligations on broadband service that are inconsistent with the [FCC's] carefully tailored regulatory scheme").  Disparate state and local requirements could "significantly disrupt the balance" struck by federal law and "impair the provision of such service by requiring each ISP to comply with a patchwork of separate and potentially conflicting requirements across all the different jurisdictions in which it operates."  2018 Order ¶ 194.  This is already happening; while California has been at the forefront of these efforts, several other states have adopted or are in the process of adopting different and incongruous net neutrality requirements, which are consistent only in their disregard for the primacy of federal law.  And given the high degree of ambiguity inherent in many of the requirements, state agencies and courts inevitably will interpret these requirements differently and further perpetuate and compound their incongruity.  The FCC expressly found that such state and local efforts to regulate in this area "could pose an obstacle to or place an undue burden on the provision of broadband Internet access service and conflict with the deregulatory approach" adopted in the 2018 Order.  *Id.* ¶ 195.  SB-822 unquestionably constitutes a state measure that "impose[s] rules or requirements that [the FCC has] repealed or decided to refrain from imposing" and thus is expressly preempted by federal law.  *Id.*  It likewise stands as an obstacle to the federal policy of reducing regulation of BIAS and thus is invalid under conflict preemption principles and precedent as well.

10.     Second, the Communications Act itself also preempts SB-822 because it imposes impermissible common carrier regulations—that is, categorical bans affecting how providers offer service that leave "no room at all for individualized bargaining."  *Verizon v. FCC*, 740 F.3d 623, 658 (D.C. Cir. 2014).  The Communications Act expressly prohibits the imposition of common carrier obligations on providers of information services and on providers of private mobile services.  *See id.* at 650 (citing 47 U.S.C. §§ 153(51), 332(c)(1)(A)).[3]  That is why, prior to the 2015 Order, the D.C. Circuit invalidated some of the same requirements that California seeks to

---

[3] "Private mobile services" are those mobile services that are not "commercial mobile radio services" as defined by the Communications Act and the FCC.  47 U.S.C. § 332(d).

COMPLAINT

impose here when the FCC applied them to such non-common-carrier services.  *See Verizon*, 740 F.3d at 650.  It is also why the FCC's adoption of these and other requirements in its now-rescinded 2015 Order was predicated on classifying BIAS as a common carrier telecommunications service.  *See* 2015 Order ¶¶ 307-308.  That predicate no longer applies because the 2018 Order restored the longstanding classification of BIAS as an information service, and of mobile BIAS as a private mobile service.  As the Eighth Circuit recently reiterated, "'any state regulation of an information service conflicts with the federal policy of nonregulation,' so that such regulation is preempted by federal law."  *Charter Advanced Servs. (MN), LLC v. Lange*, --- F.3d ---, No. 17-2290, 2018 WL 4260322, at *2 (8th Cir. Sept. 7, 2018) (quoting *Minn. Pub. Utils. Comm'n v. FCC*, 483 F.3d 570, 580 (8th Cir. 2007)).  Thus, SB-822 impermissibly imposes common carrier regulations on services that are statutorily exempt from such regulation.  The Communications Act also expressly prohibits states from "regulat[ing] the entry of or the rates charged by . . . any private mobile service."  47 U.S.C. § 332(c)(3)(A).  Yet SB-822 engages in just such regulation by imposing a ban on certain kinds of zero-rating.  Thus, this Court should declare SB-822 unconstitutional under the Supremacy Clause of the United States Constitution and enjoin Defendant from enforcing or giving effect to it.

11.    Finally, SB-822 violates the "dormant" or "negative" Commerce Clause of the United States Constitution by regulating conduct occurring wholly outside California's borders.  Specifically, SB-822 regulates Internet services that involve overwhelmingly interstate communications, which the FCC has found cannot practically be separated from instances of purely intrastate electronic communications.  Moreover, in regulating Internet interconnection, SB-822 is not limited to ISPs' dealings with California customers; it also effectively regulates ISPs' contracts with edge providers in all fifty states, and the exchange of traffic occurring wholly outside of California.  SB-822 also violates the "dormant" or "negative" Commerce Clause because it imposes burdens on interstate commerce that far outweigh any purported benefits to California by re-imposing rules that the FCC expressly found to harm interstate commerce and to offer no net benefits.

COMPLAINT

1

## JURISDICTION AND VENUE

2      12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the

3  Associations' claims arise under the laws of the United States, including the Communications Act,

4  the 2018 Order, 42 U.S.C. § 1983, and the Supremacy and Commerce Clauses of the United States

5  Constitution.  This Court has equitable jurisdiction to enjoin unconstitutional action.  *Armstrong*

6  *v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

7      13.    Because an actual controversy within the Court's jurisdiction exists, this Court may

8  grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C.

9  §§ 2201-2202.

10      14.    Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b)(1)

11  and (b)(2), because Defendant is located within this district and a substantial part of the events

12  giving rise to the Associations' claims occurred in this district.

13

## PARTIES

14      15.    Plaintiff ACA is a trade association of small and medium-sized cable companies in

15  the United States.  Many of ACA's members are small, family-owned businesses that have served

16  their communities for decades.  Multiple ACA members offer broadband services, including BIAS,

17  to households, businesses, and governmental entities in California.

18      16.    Plaintiff CTIA is a non-profit association that represents the wireless

19  communications industry.  Members of CTIA include wireless broadband ISPs operating in the

20  State of California and throughout the country, as well as providers of other wireless services,

21  device manufacturers, and other wireless industry participants.

22      17.    Plaintiff NCTA is the principal national trade association of the cable industry in

23  the United States.  Its members include cable providers offering broadband services, including

24  BIAS, to households, businesses, and governmental entities throughout the country, including in

25  California.

26      18.    Plaintiff USTelecom is a non-profit association of service providers and suppliers

27  for the telecommunications industry.  Its members provide broadband services, including BIAS

28

8

COMPLAINT

1   and new Internet Protocol-based services over fiber-rich networks, to millions of consumers and

2   businesses across the country, including in California.

3       19.   The Associations have standing to bring the claims asserted in this Complaint on

4   behalf of their members because (a) the subject matter of this suit is germane to the Associations'

5   purpose; (b) members of the Associations would have standing on their own to bring these claims,

6   given the substantial harms that members face if the invalid and unconstitutional state measures at

7   issue here were to be enforced; and (c) neither the claims asserted, nor the relief requested, requires

8   the participation of the Associations' individual members in this lawsuit.

9       20.   Defendant Xavier Becerra is the Attorney General of California.  Pursuant to

10  Article V, Section 13 of the California Constitution, as well as his common law *parens patriae*

11  power, he is the "chief law officer of the State" with the "duty" "to see that the laws of the State

12  are uniformly and adequately enforced," and to "prosecute any violations of law" whenever "in

13  the opinion of the Attorney General any law of the State is not being adequately enforced."  Cal.

14  Const. art. V, § 13.   Additionally, under California's Unfair Competition Law, the Attorney

15  General has the power to bring an action against businesses for violations of SB-822's

16  requirements.  *See* Cal. Bus. & Prof. Code § 17200 (prohibiting "any unlawful, unfair or fraudulent

17  business act"); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tele. Co.*, 973 P.2d 527, 540 (Cal. 1999)

18  ("By proscribing 'any unlawful' business practice, 'section 17200 borrows violations of other laws

19  and treats them as unlawful practices' . . . ." (quoting *State Farm Fire & Cas. Co. v. Super. Ct.*, 53

20  Cal. Rptr. 2d 229, 234 (Ct. App. 1996))); Cal. Bus. & Prof. Code § 17204 (providing enforcement

21  authority to the Attorney General for violations of § 17200).  The Attorney General thus has both

22  "direct authority and practical ability to enforce the challenged statute."  *Nat'l Audubon Soc'y, Inc.*

23  *v. Davis*, 307 F.3d 835, 846 (9th Cir. 2002).  The Attorney General has pledged that it will be "a

24  priority for his office" to "preserv[e] net neutrality protections for consumers."  Cal. Sen. Judiciary

25  Comm., SB-822, at 22 (Apr. 23, 2018), *available at* https://leginfo.legislature.ca.gov/faces/

26  billAnalysisClient.xhtml?bill_id=201720180SB822.  He is sued in his official capacity only.

27

28

COMPLAINT

## STATEMENT OF FACTS

### *The Associations' Members*

21.     The Associations' members provide BIAS to customers throughout California. These members provide BIAS in California (and throughout the country) using extensive wired and wireless networks that enable the routing of data packets along dynamic paths without regard for state or even national boundaries.  It is "well-settled" that the Associations' members' BIAS offerings are "jurisdictionally interstate service[s] because 'a substantial portion of Internet traffic involves accessing interstate or foreign websites.'"  2018 Order ¶ 199 (quoting *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 5 (D.C. Cir. 2000)); *see also id.* ¶¶ 199-200 (collecting cites to extensive prior FCC and judicial precedent in support).  "Because both interstate and intrastate communications can travel over the same Internet connection (and indeed may do so in response to a single query from a consumer), it is impossible or impracticable for ISPs to distinguish between intrastate and interstate communications over the Internet or to apply different rules in each circumstance." *Id.* ¶ 200.

22.     Moreover, as the Internet is a "network of networks," ISPs must interconnect with numerous other network operators to exchange Internet traffic—including large "backbone" providers, which carry high volumes of Internet traffic, content delivery networks ("CDNs"), which store content in geographically distributed locations for more efficient delivery, and other intermediate network providers.  The highly interconnected nature of the Internet ensures that there are many paths to an ISP's network for any particular Internet content provider (also known as an "edge provider").  Although many edge providers pay intermediate network providers to reach ISPs and their customers, some edge providers have found it more efficient to invest in their own content distribution networks, which they then seek to interconnect directly with ISPs.  Those edge providers often pay ISPs consideration for that direct interconnection, consistent with longstanding and well-established market practices.  ISPs typically offer "settlement-free" interconnection (that is, interconnection without monetary payment by either party) to network operators that offer a generally balanced exchange of traffic and mutual value to the providers (and their customers) on both sides.  Where the exchange of traffic or value instead is significantly out of balance, it is

10

COMPLAINT

1   common for the interconnection arrangement to involve payment in one direction or the other.

2   Moreover, interconnecting providers often agree to share the costs of upgrading capacity at

3   interconnection points caused by shifts in traffic volumes or flows.  These payments help ensure

4   that no provider is saddled with funding network costs imposed disproportionately by another, and

5   provide market-driven incentives for interconnecting parties to exchange Internet traffic in an

6   efficient and predictable manner.  This is how the Internet has operated for decades.  Absent such

7   paid interconnection arrangements, all network costs would be shifted to ISPs' customers.  In

8   addition, the potential for traffic congestion that degrades end users' online experiences would

9   increase significantly.

10               *Federal Law Governing Broadband Internet Access Service*

11        23.    The provision of BIAS in general—and the issue of net neutrality in particular—

12   have long been the focus of substantial regulatory interest and activity at the federal level.  That is

13   as it should be, given the inherently interstate nature of Internet service.  For many years before

14   2015, the FCC repeatedly made clear that BIAS is properly classified as an interstate information

15   service and, therefore, free from common-carrier-style regulation.  *See, e.g.*, *In re GTE Telephone*

16   *Operating Cos.*, Memorandum Opinion and Order, 13 FCC Rcd. 22466 ¶¶ 16-19 (1998); *Inquiry*

17   *Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory

18   Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd. 4798 ¶¶ 38-39 (2002); *Appropriate*

19   *Framework for Broadband Access to the Internet Over Wireline Facilities*, Report and Order and

20   Notice of Proposed Rulemaking, 20 FCC Rcd. 14853 ¶ 12 (2005); *United Power Line Council's*

21   *Petition for Declaratory Ruling Regarding the Classification of Broadband Over Power Line*

22   *Internet Access Service as an Information Service*, Memorandum Opinion and Order, 21 FCC Rcd.

23   13281 (2006); *Appropriate Regulatory Treatment for Broadband Access to the Internet Over*

24   *Wireless Networks*, Declaratory Ruling, 22 FCC Rcd. 5901 (2007); *see also National Cable &*

25   *Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1003 (2005) (upholding the FCC's

26   2002 determination that BIAS is an information service).

27        24.    **The 2015 Order.**  In 2015, the FCC temporarily deviated from its longstanding

28   classification of BIAS as an information service when it adopted the 2015 Order, which

COMPLAINT

reclassified only "mass-market retail" BIAS as an interstate "telecommunications service." *See* 2015 Order ¶¶ 25, 189, 308.  The FCC simultaneously reclassified "mass-market retail" mobile BIAS as a "commercial mobile service." *Id.* ¶ 388.  With these changes to then-existing law, the FCC was able to subject mass-market fixed and mobile BIAS to common carrier regulation. Exercising that newly created authority, it did just that, adopting a set of net neutrality regulations governing BIAS providers.  The regulations included the following three so-called "bright-line" rules:

- No blocking:  "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not block lawful content, applications, services, or nonharmful devices, subject to reasonable network management."  2015 Order ¶ 15.

- No throttling: "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not impair or degrade lawful Internet traffic on the basis of Internet content, application, or service, or use of a non-harmful device, subject to reasonable network management."  *Id.* ¶ 16.

- No paid prioritization:  "A person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not engage in paid prioritization.  'Paid prioritization' refers to the management of a broadband provider's network to directly or indirectly favor some traffic over other traffic, including through use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity."  *Id.* ¶ 18.

25.    The FCC also adopted a general "Internet Conduct Standard," which stated: "Any person engaged in the provision of broadband Internet access service, insofar as such person is so engaged, shall not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful

COMPLAINT

content, applications, services, or devices available to end users.  Reasonable network management shall not be considered a violation of this rule." *Id.* ¶ 21.  Notably, in the context of adopting the Internet Conduct Standard, the FCC considered a ban on "zero-rating"—a practice that allows ISPs (typically those that provide mobile BIAS) to exclude certain content from an end user's monthly data usage allowance.  *Id.* ¶ 151.  But the FCC declined to impose a presumptive ban, observing that "new [zero-rated] service offerings, depending on how they are structured, could benefit consumers and competition," and thus opting instead for case-by-case review of specific zero-rating plans under the Internet Conduct Standard.  *Id.* ¶ 152.  The 2015 Order expressly acknowledged that the Internet Conduct Standard, together with the bright-line rules noted above, constituted common carrier regulation.  *See id.* ¶¶ 288-296.

26.    Additionally, the 2015 Order provided for "case-by-case" review of the "reasonable[ness]" of ISPs' practices when interconnecting with other network operators and exchanging Internet traffic through those connections.  *See id.* ¶¶ 202-206.  This, too, was framed as an application of common carrier obligations to BIAS.  *See id.* ¶ 204.  In establishing this case-by-case review of ISPs' interconnection and traffic-exchange practices, the FCC expressly declined to "apply the open Internet rules to interconnection."  *Id.* ¶ 30; *see also id.* ¶ 202 ("We do not believe that it is appropriate or necessary to subject arrangements for Internet traffic exchange . . . to the rules we adopt today.").  The FCC also rejected proposals to ban payments in the context of Internet interconnection and traffic exchange—which, as noted above, have long been commonplace in the marketplace and help promote efficiency and predictability.  *See id.* ¶ 202 (declining "to draw policy conclusions concerning new paid Internet traffic-exchange arrangements between broadband Internet access service providers and edge providers, CDNs, or backbone services").

27.    The FCC supplemented these common carrier regulations with rules intended to ensure that Internet access service providers are transparent about their network management practices and terms of service.  To that end, the 2015 Order left in place transparency requirements first adopted in 2010, though the FCC added certain non-codified "enhancements" to the requirements.  *See id.* ¶ 23 ("A person engaged in the provision of broadband Internet access

COMPLAINT

1   service shall publicly disclose accurate information regarding the network management practices,

2   performance, and commercial terms of its broadband Internet access services sufficient for

3   consumers to make informed choices regarding use of such services and for content, application,

4   service, and device providers to develop, market, and maintain Internet offerings."); *id.* ¶ 24

5   (describing the enhancements).

6         28.   **The 2018 Order.**  In 2017, the FCC reexamined this departure from its historical

7   approach to the Internet and adopted the 2018 Order, which restored the pre-2015 classification of

8   BIAS as an interstate "information service," as well as the pre-2015 classification of mobile BIAS

9   as a "private mobile service."  Relying on both the Communications Act, which precludes

10   subjecting these services to common carrier regulation, and an in-depth analysis of the public

11   interest, the FCC repealed the so-called bright-line rules in the 2015 Order on blocking, throttling,

12   and paid prioritization, as well as the Internet Conduct Standard.  *See* 2018 Order ¶¶ 239, 246-267.

13   The 2018 Order also eliminated the 2015 Order's case-by-case oversight of ISPs' interconnection

14   practices, based on extensive record evidence showing that "present competitive pressures in the

15   market for Internet traffic exchange . . . undermine the need for regulatory oversight."  *Id.* ¶ 170.

16   In lieu of these requirements, the 2018 Order revised the transparency rule to expressly require

17   that BIAS providers publicly and clearly disclose any blocking, throttling, paid prioritization, or

18   affiliated prioritization.  *See id.* ¶ 220.  The FCC preserved the core requirement that ISPs disclose

19   key terms relating to broadband performance, commercial terms, and network management, *see*

20   *id.* ¶ 115, while rescinding certain "enhancements" that the 2015 Order had imposed, such as

21   requirements concerning the disclosure of highly technical performance characteristics, which the

22   FCC determined would not be useful to consumers, *see id.* ¶¶ 214-215, 221-222.

23         29.   The FCC further determined that the FTC has both the authority and capability to

24   "enforce any commitments made by ISPs regarding their network management practices,"

25   including the net neutrality commitments the Associations and their members had made publicly.

26   *Id.* ¶ 141 (citing 15 U.S.C. § 45(a)).  It further noted that federal antitrust laws, enforceable by both

27   the FTC and Department of Justice, provide additional protections.  *See id.* ¶ 143.  Thus, the FCC

28   concluded that "the [revised] transparency rule," "in combination with the state of broadband

COMPLAINT

1   Internet access service competition and the antitrust and consumer protection laws, obviates the

2   need for conduct rules by achieving comparable benefits at lower cost." *Id.* ¶ 239.

3          30.     The 2018 Order further reaffirmed the FCC's longstanding (and bipartisan)

4   determination that BIAS is inherently interstate and must be governed by "a uniform set of federal

5   regulations, rather than by a patchwork that includes separate state and local requirements." 2018

6   Order ¶ 194.  Indeed, the FCC has long confirmed its "preemption authority to preclude states

7   from imposing obligations on broadband service that are inconsistent with the [FCC's] carefully

8   tailored regulatory scheme." 2015 Order ¶ 433.  Federal courts have likewise affirmed that BIAS

9   is an "'interstate and foreign communication by wire' within the meaning of Title I of the

10  Communications Act," *Comcast Corp. v. FCC*, 600 F.3d 642, 646-47 (D.C. Cir. 2010) (quoting

11  47 U.S.C. § 152(a)), and thereby subject to the "centraliz[ed] authority" of the FCC, 47 U.S.C.

12  § 151.

13         31.     Building on its long-held position, the FCC explained in the 2018 Order that it was

14  establishing "a calibrated federal regulatory regime [for broadband] based on the pro-competitive,

15  deregulatory goals of the 1996 Act." 2018 Order ¶ 194.  Allowing state and local governments to

16  adopt their own separate, and more burdensome, requirements for broadband service, the FCC

17  explained, could "significantly disrupt the balance" struck by federal law and "could impair the

18  provision of such service by requiring each ISP to comply with a patchwork of separate and

19  potentially conflicting requirements across all the different jurisdictions in which it operates." *Id.*

20         32.     Accordingly, and central to this suit, the FCC included a broadly worded, express

21  preemption provision in the 2018 Order.  That provision states that the 2018 Order "preempt[s]

22  *any* state or local measures that would effectively impose rules or requirements that [the FCC has]

23  repealed or decided to refrain from imposing in this order or that would impose more stringent

24  requirements for *any aspect* of broadband service" addressed in that order, 2018 Order ¶ 195

25  (emphases added), "includ[ing] any state laws that would require the disclosure of [BIAS]

26  performance information, commercial terms, or network management practices in any way

27  inconsistent with the transparency rule adopted" by the 2018 Order, *id.* ¶ 195 n.729.  This

28  preemption is necessary, the FCC explained, because state efforts to regulate in this area "could

COMPLAINT

1    pose an obstacle to or place an undue burden on the provision of broadband Internet access service

2    and conflict with the deregulatory approach" adopted in the 2018 Order. *Id.* Indeed, even the

3    2015 Order determined "that broadband Internet access service is jurisdictionally interstate for

4    regulatory purposes," 2015 Order ¶ 431—as the 2018 Order reaffirmed, *see* 2018 Order ¶ 199—

5    and admonished states not to "frustrate federal broadband policies," 2015 Order ¶ 433.

6         33.    The 2018 Order enjoys the full protection of the Supremacy Clause. The Supreme

7    Court has long recognized that "[f]ederal regulations have no less pre-emptive effect than federal

8    statutes," *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982), and that "a

9    federal agency acting within the scope of its congressionally delegated authority may pre-empt

10   state regulation and hence render unenforceable state or local laws that are otherwise not

11   inconsistent with federal law," *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988) (internal

12   quotation marks omitted). Moreover, a federal determination that an area is best left "*un*regulated"

13   carries "as much pre-emptive force as a decision *to* regulate." *Ark. Elec. Co-op. v. Ark. Pub. Serv.*

14   *Comm'n*, 461 U.S. 375, 384 (1983) (emphasis in original); *see also Geier v. Am. Honda Motor*

15   *Co.*, 529 U.S. 861, 883-84 (2000) (federal determination that statutory objectives, including

16   promoting innovation, were best achieved through less rather than more regulation constituted a

17   substantive determination with preemptive force); *Minn. Pub. Utils. Comm'n*, 483 F.3d at 580

18   (recognizing that "deregulation" is a "valid federal interest[] the FCC may protect through

19   preemption of state regulation"). States thus must respect, and not flout, the 2018 Order's policy

20   determinations regarding the proper regulatory status of BIAS and its preemption provision, just

21   like any other federal law.

22                            *California's SB-822*

23        34.    On August 31, 2018, the California Legislature passed SB-822. From inception

24   through enactment, the sponsors of SB-822 have made crystal clear that the purpose of this statute

25   is to nullify the FCC's decision to restore the longstanding, light-touch regulatory approach, and

26   thus to recreate the rejected federal regime at the state level. *E.g.*, Cal. Assembly Comm. on

27   Commc'ns & Conveyance, SB-822, at 6 (Aug. 22, 2018), *available at*

28   https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB822

                                    16

                                                                    COMPLAINT

1  (quoting bill authors' statement that "[w]hen the federal government decides to walk away from

2  this duty [to regulate BIAS] and its authority to regulate this industry, it is up to the states to protect

3  their residents," and that "Senate Bill 822 steps in and puts California at the national forefront of

4  ensuring an open internet"); *id.* at 9 ("This bill seeks to codify the prescribed [2015 Order rules

5  that were repealed by the 2018 Order] . . . ."); Press Release, *Senators Wiener and De Leon and*

6  *Assemblymembers Santiago and Bonta Announce Agreement on California Bill with Strongest Net*

7  *Neutrality Protections in the Country* (July 5, 2018), http://sd11.senate.ca.gov/news/20180705-

8  senators-wiener-and-de-leon-and-assemblymembers-santiago-and-bonta-announce-agreement

9  ("[T]he legislators announced an agreement on bill language that will ensure California enacts

10  strong, comprehensive, and enforceable net neutrality reflecting what was repealed by the FCC

11  last year."); Press Release, *Senator Wiener to Introduce Net Neutrality in California* (Dec. 14,

12  2017),           http://sd11.senate.ca.gov/news/20171214-senator-wiener-introduce-net-neutrality-

13  legislation-california (announcing "plans to introduce legislation to establish net neutrality

14  protections in California after the Federal Communications Commission repealed national Net

15  Neutrality regulations").

16         35.     SB-822 directly re-imposes the very same regulatory restrictions that the FCC

17  repealed and expressly preempted states from enacting in the 2018 Order.  SB-822 prohibits ISPs

18  offering BIAS to customers in California from, among other things, "[b]locking lawful content,

19  applications, services, or nonharmful devices"; "[i]mpairing or degrading lawful Internet traffic

20  on the basis of Internet content, application, or service"; and "[e]ngaging in paid prioritization."

21  Cal. Civ. Code § 3101(a)(1), (2), (4).[4]  These provisions are largely identical to the three bright-

22  line rules adopted in the 2015 Order and later rescinded in the 2018 Order.  *Compare* Cal. Civ.

23  Code § 3101(a)(1), *with* 2015 Order ¶ 15; *compare* Cal. Civ. Code § 3101(a)(2), *with* 2015 Order

24  ¶ 16; *compare* Cal. Civ. Code § 3101(a)(4), *with* 2015 Order ¶ 18.  SB-822 also incorporates the

25  Internet Conduct Standard adopted in the 2015 Order, and rescinded in the 2018 Order, nearly

26  verbatim.  *Compare* Cal. Civ. Code § 3101(a)(7)(A), *with* 2015 Order ¶ 21.  Moreover, while the

27  _____

28  [4] Citations to the California Civil Code refer to the Code sections that will be amended by SB-822.

COMPLAINT

1    2018 Order eliminated the 2015 Order's scheme for overseeing ISPs' interconnection and traffic-

2    exchange practices, SB-822 subjects those practices to regulation, and it does so without regard to

3    whether the interconnection and traffic exchange occurs inside or outside of California.  *See* Cal.

4    Civ. Code § 3101(a)(9).[5]

5         36.    Indeed, SB-822 actually goes *further* than the 2015 Order.  First, while the 2015

6    Order declined to prohibit zero-rating and instead subjected the practice to case-by-case review

7    under the Internet Conduct Standard, *see supra* ¶ 25, SB-822 imposes outright bans on "[e]ngaging

8    in zero-rating in exchange for consideration, monetary or otherwise, by third parties" and on

9    "[z]ero-rating some Internet content, applications, services, or devices in a category of Internet

10   content, applications, services, or devices, but not the entire category."  Cal. Civ. Code §

11   3101(a)(5), (6).  These prohibitions effectively outlaw zero-rated offerings that have been available

12   in the marketplace since before the 2015 Order and remain available today, including in California,

13   thereby depriving consumers of the ability to use data for free.

14        37.    Second, while the 2015 Order opted for case-by-case review of ISPs'

15   interconnection and traffic-exchange practices, and expressly declined to prohibit paid

16   interconnection and traffic-exchange arrangements or to apply other bright-line prohibitions to

17   those arrangements, *see supra* ¶ 26, SB-822 imposes restrictions on direct interconnection

18   arrangements between ISPs and edge providers.  In particular, SB-822 restricts ISPs offering BIAS

19   from "entering into ISP traffic exchange agreements that . . . evade the prohibitions contained" in

20   Sections 3101 and 3102.  Cal. Civ. Code § 3101(a)(9); *see id.* § 3100(m) (defining ISP traffic

21   exchange agreements).  SB-822 also restricts those ISPs from "[r]equiring consideration, monetary

22   or otherwise, from edge providers, including, but not limited to, in exchange for any of the

---

24   [5] SB-822 also includes its own disclosure requirement for ISPs—one that differs from the revised

25   transparency rule adopted in the 2018 Order.  *Compare* 2018 Order ¶ 215 (requiring disclosure of
     "accurate information regarding the network management practices, performance, and commercial

26   terms of its broadband Internet access services sufficient to enable consumers to make informed
     choices regarding the purchase and use of such services and entrepreneurs and other small

27   businesses to develop, market, and maintain Internet offerings"), *with* Cal. Civ. Code § 3101(a)(8)
     (requiring that disclosures also be sufficient "for content, application, service, and device providers

28   to develop, market, and maintain Internet offerings").

COMPLAINT

1    following: (A) [d]elivering Internet traffic to, and carrying Internet traffic from, the Internet

2    service provider's end users[;] (B) [a]voiding having the edge providers' content, application,

3    service, or nonharmful device blocked from reaching the Internet service provider's end users[;]

4    [and] (C) [a]voiding having the edge providers' content, application, service, or nonharmful device

5    impaired or degraded." *Id.* § 3101(a)(3).  And Section 3104 provides that "any waiver of the

6    provisions of this title is contrary to public policy and shall be unenforceable and void." *Id.* § 3104.

7    It is not clear how these vague provisions will be interpreted and applied, but they create substantial

8    marketplace uncertainty with regard to existing and future arrangements between ISPs and edge

9    providers.

10        38.    Governor Brown signed SB-822 into law on September 30, 2018.

11        39.    SB-822 is scheduled to take effect on January 1, 2019.  *See* Cal. Const. art. IV,

12   § 8(c)(1) ("[A] statute enacted at a regular session shall go into effect on January 1 next following

13   a 90-day period from the date of enactment of the statute . . . .").

14                                      ***SB-822 Is Preempted***

15        40.    The admitted purpose and unmistakable effect of SB-822 is to reinstate rules the

16   FCC had adopted in the 2015 Order but later repealed in the 2018 Order.  Indeed, the final Senate

17   floor analysis of the bill noted that its purpose is to effect a "continuation of net neutrality

18   requirements" established by the 2015 Order but repealed by the 2018 Order.  Cal. Sen. Rules

19   Comm., Senate Floor Analysis: SB-822, at 4 (Aug. 30, 2018), *available at*

20   https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201720180SB822.

21        41.    Accordingly, SB-822 is the very kind of state measure that the 2018 Order and the

22   Communications Act each preempt.  As explained above, the 2018 Order expressly "preempt[s]

23   *any* state or local measures that would effectively impose rules or requirements that [the FCC has]

24   repealed or decided to refrain from imposing in this order or that would impose more stringent

25   requirements for *any aspect* of broadband service" addressed in the 2018 Order.  2018 Order ¶ 195

26   (emphases added).  The 2018 Order's preemption of "state or local measures" plainly covers SB-

27   822, which seeks to reinstate net neutrality requirements that the 2018 Order repealed and thus

28   explicitly "impose[s] [net neutrality] requirements" on ISPs in their provision of BIAS.  *Id.*  The

                                              19

1   "rules or requirements that [the FCC] repealed" in the 2018 Order include the prior no-blocking

2   rule, no-throttling rule, no-paid-prioritization rule, the Internet Conduct Standard, and oversight of

3   ISPs' interconnection and traffic-exchange practices.  SB-822 reinstates all of these repealed

4   rules.[6]

5      42. In fact, SB-822 goes even further than the repealed federal rules.  As set forth above,

6   SB-822 includes a ban on zero-rating, which the 2015 Order never did.  *See* 2015 Order ¶ 153

7   (declining to ban zero-rating and subjecting the practice to case-by-case review under the Internet

8   Conduct Standard). SB-822 also imposes ambiguous restrictions that create substantial

9   uncertainty regarding paid interconnection agreements between ISPs and edge providers, which

10   the 2015 Order sought to protect from heavy-handed regulation.  *See, e.g., id.* ¶ 202 (declining to

11   outlaw paid interconnection or to apply net neutrality rules to the interconnection marketplace).

12   Because these aspects of SB-822 "impose *more stringent* requirements" than those repealed in the

13   2018 Order, they not only are preempted by the 2018 Order, 2018 Order ¶ 195 (emphasis added),

14   but would even have been preempted by the 2015 Order, *see* 2015 Order ¶ 433.

15      43. Even apart from the 2018 Order's express preemption ruling, SB-822 stands as an

16   obstacle to the federal policy of reducing regulation of BIAS by re-imposing the same regulations

17   the FCC repealed, and by enacting more intrusive restrictions in other areas.  *See, e.g., City of New*

18   *York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will

19   pre-empt any state or local law that conflicts with such regulations or frustrates the purposes

20   thereof."); *Ark. Elec. Co-op.*, 461 U.S. at 384 (a federal determination that the area is best

21   left "*un*regulated" carries "as much pre-emptive force as a decision *to* regulate") (emphasis in

22   original). These measures blatantly flout the FCC's statutorily authorized, federal policy

23

24

---

25   [6] As noted above, SB-822 also includes a disclosure requirement that differs from the 2018 Order's
  revised transparency rule.  *See supra* note 5.  This requirement is preempted as well, as the 2018
26   Order specifically preempts "any state laws that would require the disclosure of broadband Internet
  access service performance information, commercial terms, or network management practices in
27   any way inconsistent with the transparency rule we adopt herein."  2018 Order ¶ 195 n.729.
  Indeed, California would have had no reason to enact SB-822's disclosure requirement if the intent
28   were merely to replicate the FCC's existing transparency rule.

COMPLAINT

1   determinations and harm ISPs and consumers both by constraining the development of innovative

2   new services at lower prices and by subjecting ISPs to a patchwork of complex, burdensome, and

3   inconsistent regulation.

4   44.   SB-822 also is flatly inconsistent with, and stands as an obstacle to, Congress's

5   statutory prohibition in the Communications Act on imposing common carrier regulation on

6   broadband providers, except "to the extent" that they provide a "telecommunications service" or,

7   in the case of wireless providers, a "commercial mobile service."   47 U.S.C. §§ 153(51),

8   332(c)(1)(A).  The FCC determined in the 2018 Order that BIAS is an information service, not a

9   telecommunications service.  2018 Order ¶ 239.  The FCC also determined that wireless BIAS is

10  a private mobile service, not a commercial mobile service.  *Id.*  In so doing, the FCC further held

11  that these classifications best achieve federal policies of "encouraging broadband investment and

12  innovation, making broadband available to all Americans and benefitting the entire Internet

13  ecosystem."  2018 Order ¶¶ 74, 86.

14  45.   Because BIAS is an information service rather than a telecommunications service,

15  broadband providers are exempt from common carrier regulation under federal law.  *See Verizon*,

16  740 F.3d at 650 (finding it "obvious that the Commission would violate the Communications Act

17  were it to regulate broadband providers as common carriers," given the Commission's decision to

18  "classify broadband providers . . . as providers of 'information services'"); *id.* (finding that,

19  "because the Commission has classified mobile broadband service as a 'private' mobile service

20  . . . , treatment of mobile broadband providers as common carriers would violate section 332").

21  And, because wireless BIAS is a private mobile service, rather than a commercial mobile service,

22  wireless broadband providers are doubly exempt from common carrier regulation.  *See Cellco*

23  *P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012).

24  46.   As explained above, the D.C. Circuit previously struck down the FCC's nearly

25  identical, pre-2015 net neutrality rules precisely because they imposed common carrier

26  requirements on providers that are exempt from such regulation.  *See id.* at 657-68 (holding that a

27  net neutrality regime that includes flat bans on blocking and paid prioritization and thus "leaves

28  no room at all for individualized bargaining" constitutes impermissible common carrier regulation

21

COMPLAINT

1   of information service providers (internal quotations marks and citations omitted)).   Even the

2   prohibition on unreasonable interference "mirrors" statutory language "establishing the basic

3   common carrier obligation not to 'make any unjust or unreasonable discrimination.'"  *Id.* at 657

4   (quoting 47 U.S.C. § 202).  By imposing common carrier regulation on both information services

5   and private mobile services, SB-822 interferes with the federal policies expressed in the 2018

6   Order and violates specific provisions of the Communications Act, and is therefore preempted on

7   both grounds.  *See Charter Advanced Servs.*, 2018 WL 4260322, at *2 ("[A]ny state regulation of

8   an information service conflicts with the federal policy of nonregulation, so that such regulation is

9   preempted by federal law." (internal quotation marks and citation omitted)).

10           47.     SB-822's ban on certain zero-rating offerings also conflicts with Congress's

11  express rejection of state authority to regulate the rates that private mobile service providers charge

12  their customers.  *See* 47 U.S.C. § 332(c)(3)(A) ("[N]o State or local government shall have any

13  authority to regulate the entry of or the rates charged by any commercial mobile service or any

14  private mobile service.").  By banning mobile BIAS providers from setting the price for certain

15  data their customers send and receive at zero, SB-822 plainly regulates the "rates charged by . . .

16  a[] private mobile service" in violation of federal law.  SB-822 is preempted in part for this reason

17  as well.

18                      ***SB-822 Violates the Dormant Commerce Clause***

19           48.     SB-822 independently violates the Commerce Clause of the United States

20  Constitution, Art. I, § 8, cl. 3, both because it regulates "commerce occurring wholly outside the

21  boundaries of [California]," *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989), and because it

22  imposes excessive burdens on interstate commerce that outweigh any purported local benefit, *Pike*

23  *v. Bruce Church, Inc.*, 397 U.S. 137, 146 (1970).  Under the "dormant" or "negative" Commerce

24  Clause, a state may not "discriminate against or burden the interstate flow of articles of

25  commerce," *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98

26  (1994), or "erect barriers against interstate trade," *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27,

27  35 (1980).  SB-822 plainly violates these core constitutional principles.

28

COMPLAINT

49.     SB-822 is *per se* unconstitutional because it "has the 'practical effect' of regulating commerce occurring wholly outside [California's] borders."  *Healy*, 491 U.S. at 332.  As the FCC has long recognized, and as courts have confirmed, Internet access service is inherently interstate, and it is impossible or impracticable to separate Internet service into intrastate and interstate activities.  *See, e.g.*, 2018 Order ¶¶ 199-200 (citing prior FCC orders).  Under the "packet switching" approach that undergirds all Internet transmissions, content is divided up into data packets that ISPs deliver by routing them over a variety of interconnected networks along dynamic paths without regard for state boundaries, which practically forecloses any effort to segregate intrastate from interstate Internet communications.  Moreover, because the wireless signals that mobile ISPs use do not stop at state borders, SB-822 also regulates extraterritorially when customers in California with smartphones access the Internet by connecting to an antenna physically located in a neighboring state.  As this Court has recognized, "'it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States.'"  *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 1024 (E.D. Cal. 2017) (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003), which had invalidated a state statute regulating certain Internet activities because the "[I]nternet's geographic reach . . . makes state regulation impracticable").

50.     Additionally, while many of the Internet's major regional interconnection points are located in California, an even larger number of those interconnection points are located outside of California.  It is not clear what the provisions of SB-822 quoted above in the interconnection context mean, but because SB-822 appears to regulate Internet traffic-exchange agreements without regard to where the interconnection points are located, it also regulates extraterritorially in at least two ways.  First, interconnection points in California also handle traffic destined for customers in other states, so SB-822 necessarily regulates Internet traffic that crosses California's borders on the way to or from out-of-state customers.  Second, because interconnection points located outside of California handle traffic destined for customers in California, SB-822 necessarily regulates traffic exchange occurring wholly outside California.  While a number of other states have enacted their own net neutrality acts or promulgated net neutrality executive

23

COMPLAINT

1    orders—and an even larger number of states have not done so—none besides California has

2    undertaken to regulate Internet interconnection and traffic exchange.  By contrast, SB-822

3    uniquely regulates such inherently interstate activities through ambiguous provisions regulating

4    the exchange of Internet traffic, including outside of California.  It is not clear how these provisions

5    will be interpreted or applied, but it appears that these California regulations could conflict with

6    other states' decisions to leave such arrangements to the marketplace, without regulation.  Just as

7    the preemption doctrines discussed above enforce the primacy of federal law with respect to

8    interstate services like BIAS, so too does the dormant Commerce Clause protect against the

9    encroachment of burdensome, inconsistent, and potentially contradictory state-level regimes for

10   such services.

11        51.    SB-822 independently violates the dormant Commerce Clause because it imposes

12   burdens on interstate commerce that are "excessive in relation to the putative local benefits" to

13   California.  *Pike*, 397 U.S. at 142.  As the FCC has found, the net neutrality requirements that the

14   State of California seeks to re-impose place significant burdens on interstate commerce that

15   outweigh any benefits those rules provide.  *See* 2018 Order ¶¶ 239-266.  For example, SB-822

16   revives the FCC's Internet Conduct Standard, which the FCC repealed because it "subjects

17   providers to substantial regulatory uncertainty" and in turn led them to "forgo or delay innovative

18   service offerings . . . that benefit consumers," and because the "net benefit of the Internet Conduct

19   Standard is *negative*."  2018 Order ¶¶ 246-249 (emphasis added).  Further, SB-822's ambiguous

20   restrictions on paid interconnection arrangements with edge providers expose to potential liability

21   existing business practices that provide benefits to consumers, edge providers, and BIAS providers

22   alike.  No less importantly, the Supreme Court has warned against the burden imposed on interstate

23   commerce caused "by subjecting activities to inconsistent regulations."  *CTS Corp. v. Dynamics*

24   *Corp. of Am.*, 481 U.S. 69, 88 (1987); *see also Nat'l Ass'n of Optometrists & Opticians v. Harris*,

25   682 F.3d 1144, 1148 (9th Cir. 2012) (recognizing that "significant burdens on interstate commerce

26   generally result from inconsistent regulation of activities that are inherently national or require a

27   uniform system of regulation").  In the context of the Internet in particular, compliance with a

28   patchwork of inconsistent state laws is inherently burdensome and likely impossible.

COMPLAINT

52.     Against these burdens, the State did not, and indeed cannot, identify any local benefits SB-822 will provide, much less benefits that outweigh the heavy burdens imposed on interstate commerce—particularly in light of the 2018 Order's investment-friendly approach to open Internet principles.  As described above, the 2018 Order implements detailed transparency requirements under which ISPs must clearly disclose their network practices and terms of service. ISPs must disclose blocking, throttling, paid prioritization, congestion management, and other network management practices and performance characteristics.  2018 Order ¶¶ 219-222.  These disclosures enable consumers to choose between ISPs; moreover, ISP commitments and disclosures are fully enforceable by the FTC,[7] as well as by state attorneys general, under federal and state unfair and deceptive trade practices laws (provided they enforce such commitments in a manner consistent with federal law).  *See* 2018 Order ¶¶ 196, 244; *see also id.* ¶ 242.  Beyond those transparency requirements, consumer protection and antitrust laws provide a backstop against any anti-competitive behavior.  The FCC found that these constraints "will significantly reduce the likelihood that ISPs will engage in actions that would harm consumers or competition." *Id.* ¶ 116.

53.     In concluding that this "lighter touch" approach would protect consumers, while better promoting innovation and investment, the FCC found, based on its evaluation of the record evidence, that "ISPs have strong incentives to preserve Internet openness," *id.* ¶ 117, and that "there has been a shift toward ISPs resolving openness issues themselves with less and less need for Commission intervention," *id.* ¶ 242.  In that vein, all of the Associations' members, either on their own or through their Associations, have made public commitments to preserve Internet openness, which, as described above, are fully enforceable.

54.     The Supreme Court has held that state regulations fail the dormant Commerce Clause's balancing test where, as here, the purported benefit "could be promoted as well with a lesser impact on interstate activities."  *Pike*, 397 U.S. at 142.  SB-822 fails even to offer a factual

---

[7] The FTC has authority under Section 5 of the FTC Act to take enforcement action challenging any "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(1).

COMPLAINT

1    basis for the claims that its provisions will benefit the State, and that is plainly insufficient to

2    overcome the excessive burdens these provisions impose on interstate commerce.  *See Bibb v.*

3    *Navajo Freight Lines, Inc.*, 359 U.S. 520, 530 (1959) (when "balanced against the clear burden on

4    commerce," a state's "inconclusive" showing of benefit is insufficient to defeat a dormant

5    Commerce Clause challenge).

6         55.    Furthermore, courts have long recognized that the dormant Commerce Clause

7    prevents states from "imped[ing] . . . the free flow of commerce" where there exists a "need of

8    national uniformity." *S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 768 (1945);

9    *Morgan v. Commonwealth*, 328 U.S. 373, 386 (1946).  Indeed, courts foresaw the very dilemma

10   SB-822 poses, with one Court of Appeals observing "that the internet will soon be seen as falling

11   within the class of subjects that are protected from state regulation because they 'imperatively

12   demand[] a single uniform rule.'"  *Am. Booksellers Found.*, 342 F.3d at 104 (quoting *Cooley v.*

13   *Bd. of Wardens*, 53 U.S. 299, 319 (1851)).  As predicted, SB-822 is at the vanguard of inconsistent,

14   incongruous, and incompatible Internet access service regulations being adopted by numerous

15   states in disregard of the need for federal primacy and uniformity.  The dormant Commerce Clause

16   is a bulwark "against inconsistent legislation arising from the projection of one state regulatory

17   regime into the jurisdiction of another State."  *Healy*, 491 U.S. at 337.  SB-822 demands

18   application of this constitutional bulwark here.

19                          ***Injury to the Associations' Members***

20        56.    SB-822 poses substantial harms to the Associations' members.  It subjects the

21   Associations' members to unconstitutional legal requirements—a significant injury in and of itself,

22   and one that courts have found to be irreparable for purposes of issuing a permanent injunction.

23   *See, e.g.*, *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013)

24   (holding that enactment of a law "in violation of the Supremacy Clause, alone, likely constitutes

25   an irreparable harm requiring the issuance of a permanent injunction"), *aff'd sub nom. Nat'l*

26   *Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208 (3d Cir. 2013).

27        57.    As set forth in more detail in the accompanying Motion for Preliminary Injunction

28   and supporting declarations, SB-822's ambiguous restrictions on paid interconnection agreements

COMPLAINT

between ISPs and edge providers create uncertainty that will harm ISPs' businesses. Those provisions will influence ongoing commercial negotiations with edge providers, and even transit providers, CDNs, and other Internet network operators, some of which undoubtedly will claim that SB-822 entitles them to free interconnection with ISPs. And SB-822 subjects ISPs' existing agreements with these entities to the threat of legal challenges under the vague "eva[sion]" standard in § 3101(a)(9). Furthermore, if the State or these other providers claim that SB-822 regulates the nationwide exchange of Internet traffic so long as that traffic is sent to or from California users of BIAS services, ISPs face the risk of having to alter their traffic exchange agreements and potentially to reconfigure their physical networks nationwide. If the State or these other providers instead claim that SB-822 regulates the exchange of all Internet traffic at points within California, some providers likely will engage in arbitrage by routing substantial amounts of their Internet traffic to interconnection points in California in an attempt to obtain increased interconnection capacity on ISPs' networks for free, thus causing significant additional congestion and disruption at ISPs' California facilities. All of these harms will result in financial losses and other injuries that members can never recoup from the State.

58.     SB-822's ban on zero-rating practices similarly outlaws existing business practices and imposes substantial harms. Members' continued offering of zero-rated services will likely expose members to enforcement action and harm their reputation, whereas discontinuing these services will lead to lost business and profits and will harm customers that currently benefit from those services, causing harm to members' reputation and customer goodwill. The resulting financial losses and other harms likewise will not be recoverable from the State.

59.     Other requirements imposed by SB-822 will also cause irreparable injury to the businesses of the Associations' members. For instance, the 2018 Order makes clear that the Internet Conduct Standard, which the FCC specifically repealed but which SB-822 reinstates for California ISPs, subjects ISPs (and their customers) to significant harm. *See* 2018 Order ¶¶ 246-252. This "vague Internet Conduct Standard subjects providers to substantial regulatory uncertainty," *id.* ¶ 247, as a result of which "ISPs and edge providers of all sizes have foregone and are likely to forgo or delay innovative service offerings or different pricing plans that benefit

COMPLAINT

1  consumers, citing regulatory uncertainty under the Internet Conduct Standard in particular," *id.*

2  ¶ 249.  The loss of business opportunities caused by the application of and compliance with SB-

3  822 will therefore result in irreparable harm to the Associations' members.  *See Stuhlbarg Int'l*

4  *Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding that the district court

5  did not abuse its discretion in finding a permanent injunction necessary to prevent loss of business

6  opportunities).

7       60.    More broadly, state measures such as these that impose net neutrality requirements

8  on ISPs "impair the provision of broadband Internet access service by requiring each ISP to comply

9  with a patchwork of separate and potentially conflicting requirements across all the different

10 jurisdictions in which it operates."  2018 Order ¶ 194.  As noted above, this harmful "patchwork"

11 of state regulation has already become a reality.   In addition to California, three other states

12 (Washington, Oregon, and Vermont) have enacted state-specific net neutrality legislation.

13 Additionally, six states (Hawaii, Montana, New Jersey, New York, Rhode Island, and Vermont)

14 have issued executive orders establishing state-specific net neutrality obligations.   There is

15 significant variation among these state measures.  For example, in contrast to SB-822, which

16 reinstates the FCC's repealed Internet Conduct Standard, the New York executive order imposes

17 an entirely different catch-all provision prohibiting ISPs from "requir[ing] that end users pay

18 different or higher rates to access specific types of content or applications."  *See* New York EO-

19 175 (signed Jan. 24, 2018), *available at* https://on.ny.gov/2LBkRGY.  Because of the inherently

20 interstate nature of the Internet, providers cannot apply California's requirements to Internet

21 packets as they move through California, and then apply New York's requirements when those

22 packets travel through New York.  The provision of BIAS is already being "impair[ed]" by the

23 imposition of these separate and inconsistent state regulatory regimes.  2018 Order ¶ 194.  And

24 these sorts of variations will only multiply as other states enact net neutrality legislation, and

25 different agencies and courts in different states interpret and enforce each state's requirements

26 differently.

27

28

COMPLAINT

**FIRST CLAIM FOR RELIEF**

*SB-822 Is Preempted by Federal Law*

61.     The allegations of paragraphs 1 through 60 above are incorporated as though fully set forth herein.

62.     SB-822 is preempted by the 2018 Order and the Communications Act.  Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, state laws that contravene validly enacted federal law are preempted and have no force or effect.  SB-822 contravenes binding federal law as set forth in the 2018 Order and the Communications Act and is therefore preempted.

63.     The 2018 Order expressly "preempt[s] *any* state or local measures that would effectively impose rules or requirements that [the FCC has] repealed or decided to refrain from imposing in this order or that would impose more stringent requirements for *any aspect* of broadband service" addressed in the 2018 Order.  2018 Order ¶ 195 (emphases added).

64.     SB-822 plainly falls within the scope of this express preemption provision.  It is a state measure that seeks to reinstate net neutrality requirements that the 2018 Order repealed.  And SB-822 expands those obligations to a larger set of practices and services than the repealed federal regulations covered, by imposing even more stringent prohibitions.  SB-822 also is subject to conflict preemption because it stands as an obstacle to and frustrates the federal policy of reducing regulation of BIAS.

65.     In addition, the 2018 Order reclassifies BIAS as an information service and mobile BIAS as a private mobile service, both of which are exempt from common carrier regulation under the Communications Act.  By basing its requirements on standards formerly predicated on classifying BIAS as a common carrier telecommunications service, SB-822 imposes common carrier regulation on ISPs in violation of the express terms of the Communications Act and federal policy and is therefore preempted for that reason as well.

66.     In addition, insofar as it bans certain zero-rating offerings, SB-822 impermissibly regulates the rates charged by private mobile service providers, in violation of 47 U.S.C. § 332(c)(3)(A).

COMPLAINT

1    67.    SB-822 subjects the Associations' members to significant and irreparable harm by

2    imposing unconstitutional requirements on members, outlawing existing business practices,

3    causing members to lose business opportunities, and impairing members' services by exposing

4    them to a patchwork of inconsistent regulation.

5    68.    California's enforcement of SB-822 will deprive the Associations' members of

6    their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

7    **SECOND CLAIM FOR RELIEF**

8    *SB-822 Violates the Dormant Commerce Clause*

9    69.    The allegations of paragraphs 1 through 68 above are incorporated as though fully

10   set forth herein.

11   70.    SB-822 violates the Commerce Clause of the United States Constitution.   U.S.

12   Const. art. I, § 8, cl. 3.

13   71.    SB-822 is a state measure that regulates conduct occurring outside the borders of

14   the State.  It also imposes burdens on interstate commerce that are not justified by putative in-state

15   benefits.  Binding precedent holds that such state regulations are invalid under the Commerce

16   Clause.

17   72.    SB-822 subjects the Associations' members to significant and irreparable harm by

18   imposing unconstitutional requirements on members, outlawing existing business practices,

19   causing members to lose business opportunities, and impairing members' services by exposing

20   them to a patchwork of inconsistent and burdensome regulation.

21   73.    California's enforcement of SB-822 will deprive the Associations' members of

22   their rights under the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983.

23   **PRAYER FOR RELIEF**

24   WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

25   1.    A declaration and judgment pursuant to 28 U.S.C. § 2201 that SB-822 is preempted

26   by federal law.

27   2.    A declaration and judgment pursuant to 28 U.S.C. § 2201 that SB-822 violates the

28   Commerce Clause.

30

COMPLAINT

3.   Preliminary and permanent injunctive relief preventing Defendant from enforcing or giving effect to SB-822.

4.   An award of reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

5.   Such further relief as the Court deems just and equitable.

Dated: October 3, 2018

Respectfully submitted,

*/s/  Marc R. Lewis*

Scott H. Angstreich*
Brendan J. Crimmins*
Rachel Proctor May*
KELLOGG, HANSEN, TODD, FIGEL, &
FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900
sangstreich@kellogghansen.com
bcrimmins@kellogghansen.com
rmay@kellogghansen.com

*Attorneys for Plaintiffs CTIA – The Wireless Association and USTelecom – The Broadband Association*

Jeffrey A. Lamken*
MOLOLAMKEN LLP
The Watergate, Suite 600
600 New Hampshire Ave., NW
Washington, DC 20037
(202) 556-2000
jlamken@mololamken.com

*Attorney for Plaintiff American Cable Association*

*Pro hac vice* motion to be filed

Marc R. Lewis (CA SBN 233306)
LEWIS & LLEWELLYN LLP
505 Montgomery Street, Suite 1300
San Francisco, CA 94111
(415) 800-0591
mlewis@lewisllewellyn.com

*Attorney for Plaintiffs American Cable Association, CTIA – The Wireless Association, NCTA – The Internet & Television Association, and USTelecom – The Broadband Association*

Matthew A. Brill*
Matthew T. Murchison*
Adam J. Tuetken*
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
matthew.brill@lw.com
matthew.murchison@lw.com
adam.tuetken@lw.com

*Attorneys for Plaintiff NCTA – The Internet & Television Association*

COMPLAINT

**EXHIBIT A**


## Senate Bill No. 822

### CHAPTER 976

An act to add Title 15 (commencing with Section 3100) to Part 4 of Division 3 of the Civil Code, relating to communications.

[Approved by Governor September 30, 2018. Filed with
Secretary of State September 30, 2018.]

LEGISLATIVE COUNSEL'S DIGEST

SB 822, Wiener. Communications: broadband Internet access service.

Existing law imposes certain obligations in the context of particular transactions, and provides mechanisms to enforce those obligations.

This bill would enact the California Internet Consumer Protection and Net Neutrality Act of 2018. This act would prohibit fixed and mobile Internet service providers, as defined, that provide broadband Internet access service, as defined, from engaging in specified actions concerning the treatment of Internet traffic. The act would prohibit, among other things, blocking lawful content, applications, services, or nonharmful devices, impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, and specified practices relating to zero-rating, as defined. It would also prohibit fixed and mobile Internet service providers from offering or providing services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services have the purpose or effect of evading the above-described prohibitions or negatively affect the performance of broadband Internet access service.

*The people of the State of California do enact as follows:*

SECTION 1.   (a)  The Legislature finds and declares all of the following:

(1)  This act is adopted pursuant to the police power inherent in the State of California to protect and promote the safety, life, public health, public convenience, general prosperity, and well-being of society, and the welfare of the state's population and economy, that are increasingly dependent on an open and neutral Internet.

(2)  Almost every sector of California's economy, democracy, and society is dependent on the open and neutral Internet that supports vital functions regulated under the police power of the state, including, but not limited to, each of the following:

(A)  Police and emergency services.

(B)  Health and safety services and infrastructure.

(C)  Utility services and infrastructure.

(D)  Transportation infrastructure and services, and the expansion of zero- and low-emission transportation options.

(E)  Government services, voting, and democratic decisionmaking processes.

(F)  Education.

(G)  Business and economic activity.

(H)  Environmental monitoring and protection, and achievement of state environmental goals.

(I)  Land use regulation.

(b)  This act shall be known, and may be cited, as the California Internet Consumer Protection and Net Neutrality Act of 2018.

SEC. 2.  Title 15 (commencing with Section 3100) is added to Part 4 of Division 3 of the Civil Code, to read:

## TITLE 15.  INTERNET NEUTRALITY

3100.  For purposes of this title, the following definitions apply:

(a)  "Application-agnostic" means not differentiating on the basis of source, destination, Internet content, application, service, or device, or class of Internet content, application, service, or device.

(b)  "Broadband Internet access service" means a mass-market retail service by wire or radio provided to customers in California that provides the capability to transmit data to, and receive data from, all or substantially all Internet endpoints, including, but not limited to, any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service. "Broadband Internet access service" also encompasses any service provided to customers in California that provides a functional equivalent of that service or that is used to evade the protections set forth in this title.

(c)  "Class of Internet content, application, service, or device" means Internet content, or a group of Internet applications, services, or devices, sharing a common characteristic, including, but not limited to, sharing the same source or destination, belonging to the same type of content, application, service, or device, using the same application- or transport-layer protocol, or having similar technical characteristics, including, but not limited to, the size, sequencing, or timing of packets, or sensitivity to delay.

(d)  "Content, applications, or services" means all Internet traffic transmitted to or from end users of a broadband Internet access service, including, but not limited to, traffic that may not fit clearly into any of these categories.

(e)  "Edge provider" means any individual or entity that provides any content, application, or service over the Internet, and any individual or entity that provides a device used for accessing any content, application, or service over the Internet.

(f)  "End user" means any individual or entity that uses a broadband Internet access service.

(g)  "Enterprise service offering" means an offering to larger organizations through customized or individually negotiated arrangements or special access services.

(h)  "Fixed broadband Internet access service" means a broadband Internet access service that serves end users primarily at fixed endpoints using stationary equipment. Fixed broadband Internet access service includes, but is not limited to, fixed wireless services including, but not limited to, fixed unlicensed wireless services, and fixed satellite services.

(i)  "Fixed Internet service provider" means a business that provides fixed broadband Internet access service to an individual, corporation, government, or other customer in California.

(j)  "Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device" means impairing or degrading any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices. The term includes, without limitation, differentiating, positively or negatively, among any of the following: (1) particular content, applications, or services; (2) particular classes of content, applications, or services; (3) lawful Internet traffic to particular nonharmful devices; or (4) lawful Internet traffic to particular classes of nonharmful devices.

(k)  "Internet service provider" means a business that provides broadband Internet access service to an individual, corporation, government, or other customer in California.

(*l*)  "ISP traffic exchange" means the exchange of Internet traffic destined for, or originating from, an Internet service provider's end users between the Internet service provider's network and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator.

(m)  "ISP traffic exchange agreement" means an agreement between an Internet service provider and another individual or entity, including, but not limited to, an edge provider, content delivery network, or other network operator, to exchange Internet traffic destined for, or originating from, an Internet service provider's end users between the Internet service provider's network and the other individual or entity.

(n)  "Mass market" service means a service marketed and sold on a standardized basis to residential customers, small businesses, and other customers, including, but not limited to, schools, institutions of higher learning, and libraries. "Mass market" services also include broadband Internet access services purchased with support of the E-rate and Rural Health Care programs and similar programs at the federal and state level, regardless of whether they are customized or individually negotiated, as well as any broadband Internet access service offered using networks supported by the Connect America Fund or similar programs at the federal and state level. "Mass market" service does not include enterprise service offerings.

(o) "Mobile broadband Internet access service" means a broadband Internet access service that serves end users primarily using mobile stations. Mobile broadband Internet access service includes, but is not limited to, broadband Internet access services that use smartphones or mobile-network-enabled tablets as the primary endpoints for connection to the Internet, as well as mobile satellite broadband services.

(p) "Mobile Internet service provider" means a business that provides mobile broadband Internet access service to an individual, corporation, government, or other customer in California.

(q) "Mobile station" means a radio communication station capable of being moved and which ordinarily does move.

(r) "Paid prioritization" means the management of an Internet service provider's network to directly or indirectly favor some traffic over other traffic, including, but not limited to, through the use of techniques such as traffic shaping, prioritization, resource reservation, or other forms of preferential traffic management, either (1) in exchange for consideration, monetary or otherwise, from a third party, or (2) to benefit an affiliated entity.

(s) "Reasonable network management" means a network management practice that is reasonable. A network management practice is a practice that has a primarily technical network management justification, but does not include other business practices. A network management practice is reasonable if it is primarily used for, and tailored to, achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the broadband Internet access service, and is as application-agnostic as possible.

(t) "Zero-rating" means exempting some Internet traffic from a customer's data usage allowance.

3101.  (a)  It shall be unlawful for a fixed Internet service provider, insofar as the provider is engaged in providing fixed broadband Internet access service, to engage in any of the following activities:

(1)  Blocking lawful content, applications, services, or nonharmful devices, subject to reasonable network management.

(2)  Impairing or degrading lawful Internet traffic on the basis of Internet content, application, or service, or use of a nonharmful device, subject to reasonable network management.

(3)  Requiring consideration, monetary or otherwise, from an edge provider, including, but not limited to, in exchange for any of the following:

(A)  Delivering Internet traffic to, and carrying Internet traffic from, the Internet service provider's end users.

(B)  Avoiding having the edge provider's content, application, service, or nonharmful device blocked from reaching the Internet service provider's end users.

(C)  Avoiding having the edge provider's content, application, service, or nonharmful device impaired or degraded.

(4)  Engaging in paid prioritization.

(5) Engaging in zero-rating in exchange for consideration, monetary or otherwise, from a third party.

(6) Zero-rating some Internet content, applications, services, or devices in a category of Internet content, applications, services, or devices, but not the entire category.

(7) (A) Unreasonably interfering with, or unreasonably disadvantaging, either an end user's ability to select, access, and use broadband Internet access service or the lawful Internet content, applications, services, or devices of the end user's choice, or an edge provider's ability to make lawful content, applications, services, or devices available to end users. Reasonable network management shall not be a violation of this paragraph.

(B) Zero-rating Internet traffic in application-agnostic ways shall not be a violation of subparagraph (A) provided that no consideration, monetary or otherwise, is provided by any third party in exchange for the Internet service provider's decision whether to zero-rate traffic.

(8) Failing to publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of those services and for content, application, service, and device providers to develop, market, and maintain Internet offerings.

(9) Engaging in practices, including, but not limited to, agreements, with respect to, related to, or in connection with, ISP traffic exchange that have the purpose or effect of evading the prohibitions contained in this section and Section 3102. Nothing in this paragraph shall be construed to prohibit Internet service providers from entering into ISP traffic exchange agreements that do not evade the prohibitions contained in this section and Section 3102.

(b) It shall be unlawful for a mobile Internet service provider, insofar as the provider is engaged in providing mobile broadband Internet access service, to engage in any of the activities described in paragraphs (1), (2), (3), (4), (5), (6), (7), (8), and (9) of subdivision (a).

3102.  (a) It shall be unlawful for a fixed Internet service provider to offer or provide services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services satisfy either of the following conditions:

(1) They have the purpose or effect of evading the prohibitions in Section 3101.

(2) They negatively affect the performance of broadband Internet access service.

(b) It shall be unlawful for a mobile Internet service provider to offer or provide services other than broadband Internet access service that are delivered over the same last-mile connection as the broadband Internet access service, if those services satisfy either of the conditions specified in paragraphs (1) and (2) of subdivision (a).

(c) Nothing in this section shall be construed to prohibit a fixed or mobile Internet service provider from offering or providing services other than broadband Internet access service that are delivered over the same last-mile

connection as the broadband Internet access service and do not violate this section.

3103.  (a)  Nothing in this title supersedes any obligation or authorization a fixed or mobile Internet service provider may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits the provider's ability to do so.

(b)  Nothing in this title prohibits reasonable efforts by a fixed or mobile Internet service provider to address copyright infringement or other unlawful activity.

3104.  Notwithstanding Section 3268 or any other law, any waiver of the provisions of this title is contrary to public policy and shall be unenforceable and void.

SEC. 3.  The provisions of this act are severable. If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

O